# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CONNECTICUT CITIZENS DEFENSE | : | 3:21-CV-1156 (OAW) |
| LEAGUE, INC., | : | |
| OREL JOHNSON, | : | |
| SHAQUANNA WILLIAMS, | : | |
| ANNE CORDERO, | : | |
| *Plaintiffs* | : | |
| | : | |
| v. | : | |
| | : | |
| JASON THODY, | : | |
| RENEE DOMINGUEZ, | : | |
| REBECA GARCIA, | : | |
| *Defendants* | : | MARCH 28, 2023 |

## RULING ON DEFENDANTS' MOTION TO DISMISS

Plaintiffs Connecticut Citizens Defense League, Inc. ("CCDL"), Orel Johnson ("Mr. Johnson"), Shaquanna Williams ("Ms. Williams"), and Anne Cordero ("Ms. Cordero") (collectively, "Plaintiffs") bring this action in response to the waiting periods associated with firearm permit applications submitted by residents of Hartford, New Haven, and Bridgeport. Each of the individual plaintiffs is a resident and firearm permit applicant in one of the named municipalities. Plaintiffs assert their claims against the Chiefs of Police for each of the three cities: Chief Jason Thody of the Hartford Police Department; Chief Renee Dominguez of the New Haven Police Department; and Chief Rebeca Garcia of the Bridgeport Police Department (collectively, "Defendants").[1] Defendants have moved to dismiss all claims against them. Mot. to Dismiss, ECF Nos. 24, 27, 40, 48, 54.

---

[1] The complaint also names as co-plaintiff Jamie Eason ("Mr. Eason"), a Waterbury resident, and defendant Chief Fernando Spagnolo ("Chief Spagnolo") of the Waterbury Police Department. On April 7, 2022, Plaintiffs filed a Rule 41(a)(1)(A) notice of voluntary dismissal against Chief Spagnolo. *See* ECF No. 55. Because Mr. Eason's claims exclusively were against Chief Spagnolo, the stipulation resulted in the dismissal of claims brought by Mr. Eason. *Id.*

Defendants argue that CCDL lacks standing (whether bringing claims on behalf of itself or its members), and that the individual plaintiffs' claims have been rendered moot in that each of them has been issued the permit for which they originally applied.

For the reasons stated herein, the court hereby **GRANTS** the pending motions to dismiss (ECF Nos. 24, 27) finding that CCDL lacks standing.  The court also finds that the individual plaintiffs lack standing to pursue injunctive relief, and that they fail to state a claim for damages as Defendants are entitled to qualified immunity.  To the extent that the individual plaintiffs seek declaratory relief, the court declines to exercise its discretion under the Declaratory Judgment Act ("DJA").  Because there are no claims remaining in this case, the complaint hereby is **DISMISSED** in its entirety.  The Clerk of Court is instructed to terminate this case from the court's docket.

## I.  BACKGROUND

In Connecticut, firearm ownership is regulated through a series of permits which allow an individual to purchase and to carry firearms.  *See* Conn. Gen. Stat. § 29-33(b) ("[N]o person may purchase or receive any pistol or revolver unless such person holds a valid permit . . . ").  Permits are issued by the Connecticut Department of Emergency Services and Public Protection ("DESPP").  Connecticut residents who wish to obtain a "permit to carry a pistol or revolver within the state," i.e., a state carry permit, must complete a two-step permitting process.  *Id.* at § 29-28(b).  First, the applicant must apply for a "temporary state permit" from their municipality (hereinafter referred to as the "municipal permit") by applying to the "local authority" within the municipality where the applicant resides.  *Id.* at § 29-28(b).  The local authority is the municipality's police chief,

chief executive officer, or other designee.  *Id.* at § 29-28(a).  The applicant must appear in person at the local police department to submit their fingerprints for a criminal background check.  *Id.* at § 29-29(b).  After receiving a "sufficient application" for the municipal permit, the local authority has a maximum of eight weeks to either approve or to deny the permit, and to forward a copy of the application to DESPP.  If the local chief of police (or other designee) approves the application, DESPP informs the applicant within eight weeks as to whether the final state permit has been approved or denied.  *Id.*

A.  The Individual Plaintiffs

The individual plaintiffs—Ms. Cordero, Mr. Johnson, and Ms. Williams—each sought to obtain a permit to carry a firearm in Connecticut.  Compl. at ¶¶ 40, 45, 50. Pursuant to the state's permitting system, they first applied for the municipal permit at their respective police departments in Bridgeport, Hartford, and New Haven.  *Id.*  During the pendency of this litigation, each individual plaintiff received his or her municipal permit.

Ms. Cordero.  "Late in 2019," Ms. Cordero called the Bridgeport Police Department ("BPD") to apply for a municipal permit.  *Id.* ¶ 50.  She was told that someone would call her back, but she never received a call.  *Id.*  She called BPD several times in the ensuing months and was told to expect a call.  *Id.*  Finally, when she called again "[i]n early July of 2021," she was told to sign up for a fingerprinting appointment.  *Id.*  However, the first available appointment was six months away, in January 2022.  *Id.*  Still, Ms. Cordero received her municipal permit on November 17, 2021, Mot. to Dismiss, ECF No. 40 (nearly two years after her initial call to BPD in late 2019, and a few months after she

initiated this case on August 30, 2021), and her permanent state permit on December 7, 2021.[2]  *Id.*

      <u>Mr. Johnson.</u>   On or about June 8, 2021, Mr. Johnson attempted to have his fingerprints taken and to submit his application for a municipal firearm permit at the Hartford Police Department ("HPD").  Compl. at ¶ 40.  Instead, he was instructed to put his name on a list so that he could be called for a fingerprint appointment,[3] and he was informed that he could not submit his application until his fingerprints had been taken.  *Id.* This case commenced on August 30, 2021.  Mr. Johnson filed his application with HPD on November 4, 2021, Chief Lee Aff. at ¶ 4, ECF No. 48-2, and he received his municipal permit on January 26, 2022, *id.* ¶ 6 (almost eight months after his initial HPD visit).

      <u>Ms. Williams</u>.  For $25, Ms. Williams purchased a set of her fingerprints, which she attempted to submit at the New Haven Police Department ("NHPD"), along with her application for a municipal firearm permit on or about August 18, 2021.  Compl. at ¶ 45. However, NHPD refused her application, *id.*, and informed her that she would have to make an appointment through an online system in order to submit it, *id.* ¶ 46.  She tried to do so, but the first available appointment was not until March 30, 2022.  *Id.* ¶ 46. Additionally, she learned that the fingerprints she purchased would be stale by then, meaning that she would have to pay for another set.  *Id.*  Ms. Williams submitted her application and fingerprints on February 3, 2022, and obtained her municipal permit on February 18, 2022.  Chief Dominguez Aff. at ¶ 4, ECF No. 48-3.  Thus, six months passed

---

[2] The motion's caption is dated "December 17, 2022", but it clearly was docketed on December 17, 2021. *See* ECF No. 40.  This is consistent with Defendant Garcia timely updating the court as to Ms. Cordero's 2021 permits.

[3] HPD indicated that it could call applicants in the order in which their names appeared on the list.  *Id.*

from her (August 18, 2021) initial NHPD contact until she obtained her municipal permit in this case that was initiated on August 30, 2021.

Plaintiffs allege that Defendants caused the only means for Connecticut residents to obtain a firearm permit to be "administratively slowed to . . . an effective shut down". Compl. at ¶ 74.  They further contend that it is unconstitutional for Defendants to have deprived them of a timely process to obtain their municipal permit.  *Id.* ¶ 63.  Moreover, Plaintiffs note that each Defendant's police department continues to timely fingerprint arrestees, applicants for employment, and individuals seeking fingerprints for purposes other than for firearm permits.  *Id.* ¶ 76.  Yet Plaintiffs note that state law subjects them to criminal prosecution if they carry a firearm without a permit.  *Id.* ¶ 92.  Finally, they take issue with the fact that residents of other Connecticut municipalities (and residents of other states) are able to "timely obtain" a permit to carry a firearm in Connecticut, *id.* ¶¶ 137–39, while Plaintiffs are unable to lawfully carry firearms, or to apply for non-resident permits, in certain other states, *id.* ¶¶ 79–81.

Plaintiffs seek injunctive and declaratory relief against Defendants in their official capacities, and relief for damages in their individual capacities.  They allege five counts: a Second Amendment violation, brought directly under the Constitution (Count One); a Section 1983 claim for violation of the Second Amendment (Count Two); a Section 1983 claim for Fifth and Fourteenth Amendment due process violations (Count Three); a Section 1983 claim for violation of the Equal Protection Clause (Count Four); and a Section 1983 claim for violation of the Privileges and Immunities Clause (Count Five).

B. <u>CCDL</u>

Joining the suit as co-Plaintiff is the CCDL, a "non-profit educational foundation" with over 41,000 members.  Compl. at ¶ 18.  CCDL states that its mission is "to preserve the effectiveness of the Second Amendment through legislative and grassroots advocacy, outreach, education, research, publication, legal action and programs focused on the Constitutional right to keep and bear arms."  *Id.*  CCDL alleges that it "has diverted, and continues to divert, significant time, money, effort and resources to addressing the Defendants' illegal and unconstitutional conduct that would otherwise be used for educational, outreach, public relations, and/or programmatic purposes."  *Id.* ¶ 19. Specifically, it states that it was "forced" to cancel its annual outreach event and to divert the previously-allocated funds, energies, and resources to the cause of this legal action. *Id.* ¶ 20.  CCDL contends that if Defendants' unconstitutional conduct is allowed to continue, its officers and executive board members will be forced to continue diverting its time, money, effort, and resources from CCDL's normal operations, such as by canceling other organizational events.  *Id.*

C. <u>Previous Related Litigation</u>

On March 10, 2020, Connecticut Governor Ned Lamont declared a public health emergency amid the COVID-19 pandemic.  *See* Declaration of Public Health and Civil Preparedness Emergencies, Office of Governor Ned Lamont (March 10, 2020), https://portal.ct.gov/-/media/Office-of-the-Governor/News/20200310-declaration-of-civil-preparedness-and-public-health-emergency.pdf.  Governor Lamont also issued a series of executive orders to address the impact of COVID-19 within the state.  Among those orders was Executive Order 7E ("EO 7E"), issued on March 17, 2020.  *See* EO 7E,

Governor Lamont's Executive Orders (March 17, 2020), https://portal.ct.gov/-
/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-
Order-No-7E.pdf.   Under EO 7E, Governor Lamont authorized police departments and
DESPP to "limit or eliminate fingerprinting hours to limit the transmission of COVID-19 or
focus resources on critical public safety needs."  *Id.* at § 2.  Thus, EO 7E allowed police
departments to stop collecting fingerprints for firearm permit applications.

In response to the executive order, CCDL and six of its members filed suit against
Governor Lamont, the Commissioner of the DESPP ("Commissioner"), and the police
chiefs of various municipalities that had suspended fingerprinting pursuant to EO 7E.  *See
Connecticut Citizens Def. League, Inc. v. Lamont*, 465 F. Supp. 3d 56, 64–65 (D. Conn.
2020), *vacated*, 6 F.4th 439 (2d Cir. 2021).  The plaintiffs in that case sought emergency
injunctive relief, and alleged claims identical to those in the instant matter: "that refusal to
take fingerprints and to process . . . permit applications amounts to a violation of the
Second Amendment, the Due Process Clause, the Equal Protection Clause, and the
Privileges and Immunities Clause of the U.S. Constitution."  *Conn. Citizens Def. League*,
465 F. Supp. 3d at 64–65.

During the pendency of that action, the plaintiffs withdrew their motion for a
preliminary injunction against the named police chiefs because they agreed to resume
fingerprinting.  *Id.*  at 65.  However, Governor Lamont and the Commissioner did not reach
an agreement with the plaintiffs.   After a hearing, the court (*Hon. Jeffrey A. Meyer, J.*)
issued a preliminary injunction directing the governor to lift the suspension on
fingerprinting, and for DESPP to resume fingerprint collection activities for applicants
seeking permits to acquire, to carry, or to possess firearms.  *Id.* at 74–75.

On July 28, 2021, the Second Circuit vacated the preliminary injunction on the grounds that the district court lacked jurisdiction to issue the injunction. *Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 441 (2d Cir. 2021) [hereinafter "*League*"]. The Second Circuit found that the plaintiffs' motion for a preliminary injunction became moot when the police chiefs had agreed to resume fingerprinting. *Id.* at 445. The court reasoned that an injunction ordering the governor to repeal EO 7E, and requiring DESPP to resume fingerprinting, provides no relief for the individual plaintiffs who sought to resume fingerprinting services at their *local* police departments. *Id.* Because local fingerprinting had resumed, "any alleged harms the plaintiffs suffered had . . . dissipated," prior to the court's entry of the preliminary injunction. *Id.* at 444.

The Second Circuit also found that CCDL lacked standing to pursue the preliminary injunction. *Id.* at 447. Because the action was brought pursuant to § 1983, CCDL could assert claims only on its own behalf (rather than on behalf of its members), and only in the event that it has suffered an injury-in-fact. *Id.* Because CCDL failed to show that the organization was "perceptibly impaired," such as by diverting resources from its "current activities" to combat the defendants' conduct, it lacked standing to pursue the preliminary injunction. *Id.* Moreover, CCDL failed to establish an element necessary for obtaining an injunction: that its organization would suffer a likelihood of future injury in the absence of injunctive relief. *Id.* at 448.

After the Second Circuit vacated the preliminary injunction, CCDL filed a notice of voluntary dismissal, and initiated the instant action with four new individual plaintiffs.

## II. STANDARD

Defendants move to dismiss under Federal Rules 12(b)(1), lack of subject matter jurisdiction, and 12(b)(6), failure to state a claim upon which relief can be granted.

### A. Subject Matter Jurisdiction under Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  A 12(b)(1) motion requires courts to "take all uncontroverted facts in the complaint as true and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).  However, "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal citations omitted). The party claiming jurisdiction must prove by a preponderance of the evidence that jurisdiction exists.  *See Malik v. Meissner*, 82 F.3d 560, 561 (2d Cir. 1996).  In reviewing a motion to dismiss based on jurisdiction, a court may consider material outside the pleadings.  *Makarova*, 201 F.3d at 113.

### B. Failure to State a Claim under Rule 12(b)(6)

To withstand a motion to dismiss brought pursuant to Rule 12(b)(6) for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  The

plausibility standard is not a probability requirement; the pleading must show, not merely allege, that the pleader is entitled to relief.  *Id.*  Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth.  *Id.*  "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'"  *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).  However, when reviewing a 12(b)(6) motion to dismiss, the court must draw all reasonable inferences in the non-movant's favor.  *Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012).  The review is confined to the facts alleged in the operative complaint unless the court elects to convert the motion to dismiss to a motion for summary judgment, an action not taken here.  *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

## III. DISCUSSION

Defendants have moved to dismiss all counts of the complaint on the following grounds: (1) that CCDL does not have standing to assert claims on behalf of its members or on behalf of itself as an organization; (2) that the individual plaintiffs' claims are moot now that each of their municipal permits has been issued; and (3) that Defendants are entitled to qualified immunity to the extent that Plaintiffs seek an award of money damages resulting from the waiting periods associated with their municipal permits.  The complaint fails to indicate which claims are brought by the individual plaintiffs and which claims are brought by CCDL, thus the use of the word "Plaintiffs" throughout the complaint suggests that each count is asserted by all Plaintiffs.  Accordingly, this opinion presumes that each count is brought by CCDL and also by the individual plaintiffs.

10

A.  CCDL's Standing

The Constitution limits the authority of a federal court to the resolution of "Cases" or "Controversies."  Constitution Art. III, § 3.  The case-or-controversy restriction requires that the party invoking federal jurisdiction have standing—the personal interest that must exist at the commencement of the litigation.  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016).  The doctrine of standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

As an initial matter, CCDL contends that because "at least one of the individual plaintiffs has standing to sue, the Court need not address a challenge to the organizational plaintiffs' standing[.]"  Pls.' Opp. at 5, ECF No. 58.  Previously, courts have declined to address an organizational plaintiff's standing where at least one individual plaintiff has met the constitutional minimums for standing.  *See e.g., Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 263–64 (1977) (declining to determine whether standing was proper for organization in light of conclusion that at least one individual plaintiff had standing); *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 53 n.2 (2006) (agreeing that the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement); *Kwong v. Bloomberg*, 723 F.3d 160, 162 (2d Cir. 2013) (finding it "unnecessary" to resolve the question of whether the organizational plaintiffs have standing where individual plaintiffs have standing); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (holding that because one organizational plaintiff has standing, the court need not determine the issue of standing for the other organizational plaintiff).

The presence of a plaintiff with valid standing does not, however, prevent a court from dismissing an organizational plaintiff where there is no clear basis for standing. *See League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Sup'rs*, 737 F.2d 155, 161 (2d Cir. 1984) (finding that organizational plaintiff lacked standing even though two out of five of the individual plaintiffs had standing); *League*, 6 F.4th 439, 447 (2d Cir. 2021) (dismissing CCDL without reference to individual plaintiffs).

In *Kwong*, the parties on appeal seemed to agree that at least one of the plaintiffs had standing. *See Kwong*, 723 F.3d at 162 n.4 ("Because . . . the individual plaintiffs have standing, we need not address the standing arguments . . . regarding the two organizational plaintiffs."). However, in the present matter, the defendants contest whether the individual plaintiffs have standing to seek injunctive relief. Thus, the court will assess CCDL's standing.

"Under current standing jurisprudence, an organization may assert two distinct types of standing: (1) organizational standing, and (2) associational standing." *Rodriguez v. Winski*, 444 F. Supp. 3d 488, 492 (S.D.N.Y. 2020) (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). CCDL maintains that it "has standing both in its own right, and in an associational capacity to vindicate the rights of its members." Pls.' Opp. at 5. This is incorrect. "It is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983[.]" *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011). CCDL's § 1983 claims challenge Defendants' municipal permit-processing delays as unconstitutional. "Neither [the] language nor the history . . . [of § 1983] suggests that an organization may sue under the Civil Rights Act for the

violations of rights of members." *League of Women*, 737 F.2d at 160 (quoting *Aguayo v. Richardson,* 473 F.2d 1090 (2d Cir.1974), *cert. denied,* 414 U.S. 1146 (1974)).

CCDL argues that it may bring Count One in an associational capacity, because it alleges "a straight constitutional challenge" of the Second and Fourteenth Amendments, rather than a cause of action pursuant to § 1983.  Pls.' Opp. at 8.  Count One is entitled, "Violation of Second Amendment Right to Keep and Bear Arms," and attempts to state a claim under the Second and Fourteenth Amendments.  Compl. ¶¶ 95–104.  An action taken directly from the Constitution, however, is impermissible.  Section 1983 is the exclusive federal remedy for violations of constitutional rights.  *See Fenner v. City of N.Y.*, No. 10-158, 2010 WL 3529529, at *1 (2d Cir. Sept. 13, 2010) (affirming dismissal of constitutional claim against state actor because such claim had to be brought under § 1983 and could not be brought directly under Constitution).  CCDL may not avoid the standing requirements of a § 1983 claim by attempting to impermissibly assert a cause of action directly from the Constitution.  *Pauk v. Bd. of Trustees of City Univ. of New York*, 654 F.2d 856, 865 (2d Cir. 1981) ("[W]hen s 1983 provides a remedy, an implied cause of action grounded on the Constitution is not available.").  Thus, where the law requires constitutional challenges to be set forth through the vehicle of § 1983, the court must **DISMISS** Count One from the complaint.

For the remainder of its claims, which are brought pursuant to § 1983, CCDL must demonstrate organizational standing in its own right.  *See Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011) (holding that organization must meet requirements of organizational standing as it cannot bring a § 1983 claim in an associational capacity).  To demonstrate organizational standing, a plaintiff must show: "(i) an imminent injury in fact to itself as an

organization (rather than to its members) that is distinct and palpable; (ii) that its injury is fairly traceable to [the act]; and (iii) that a favorable decision would redress its injuries." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (internal quotation marks omitted).

An organization has suffered an injury-in-fact when it can show a "perceptible impairment" to its core activities, resulting in "some perceptible opportunity cost" as a result of the alleged violation. *Nnebe*, 644 F.3d at 157; *see also N.Y. State Citizens' Coal. for Child. v. Poole*, 922 F.3d 69, 75 (2d Cir. 2019). An organization may suffer the requisite injury when it is "forced to devote significant resources" to counteract a defendant's actions. *Ragin v. Harry Macklowe Real Est. Co.*, 6 F.3d 898, 905 (2d Cir. 1993) (internal quotation marks omitted). Important to the analysis is "the *involuntary* and *material* impacts on *core activities* by which the organizational mission has historically been carried out." *Connecticut Parents Union v. Russell-Tucker*, 8 F.4th 167, 173 (2d Cir. 2021) (emphasis in original).

In *League*, the Second Circuit found that CCDL lacked standing to bring its claims because it could not identify "any 'current activities' from which it diverted resources" in order to combat the defendants' conduct. *League*, 6 F.4th at 447. Pursuits integral to CCDL's mission (including legal action) were deemed to be its usual activities rather than any type of departure therefrom. *Id.* Here, CCDL submits an affidavit from its president, Holly Sullivan ("Ms. Sullivan"), asserting that the organization was forced to cancel its annual outreach event and to divert the "expected funds, energies, and resources to the cause of this legal action." Sullivan Aff. ¶ 6. However, CCDL's unilateral decision to cancel its annual outreach event does not reflect the "involuntary material burden"

14

required for showing a perceptible impairment.  *Russell-Tucker*, 8 F.4th 167, 173 (2d Cir. 2021).  "[E]xpenditures or other activities, if incurred at the organization's own initiative, cannot support a finding of injury[.]"  *Id.* at 174.[4]  CCDL fails to demonstrate how the cancellation of its outreach event was an involuntary byproduct of the defendants' challenged conduct in delaying fingerprinting for applicants seeking a municipal permit. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (finding that organization suffered injury in fact where the challenged conduct directly impaired organization's ability to provide core counseling and referral services to clients).

There is no allegation that Defendants' actions impaired CCDL's ability to carry out the actual activities noted in its mission: legislative and grassroots advocacy, outreach, education, research, publication, programming, and legal action.  *See* Compl. ¶ 18. Indeed, it is insufficient to claim that the organization has suffered an injury in fact when it merely has diverted funds from one core activity (an outreach event) to another (legal action).  With respect to its pursuit of injunctive relief, CCDL also fails to show that Defendants' continued conduct will result in a likelihood of future injury to the organization, a prerequisite noted in *League*.  6 F.4th at 448 (citing *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)).  While Ms. Sullivan states, "CCDL will be forced to cancel additional outreach events going forward", Sullivan Aff. ¶ 9, a conclusory statement about future outreach events does not establish an immediate irreparable injury to the organization; further, CCDL cannot rely on a past injury (such as a canceled

---

[4] It is even less persuasive to blame Defendants for a unilaterally-cancelled event *during a pandemic*.  *See A List of What's Been Canceled Because of the Coronavirus*, NY TIMES (Jan. 21, 2021), https://www.nytimes.com/article/cancelled-events-coronavirus.html; Wilson Wong, *Major events are getting canceled or postponed again because of Covid. Here's a running list.*, NBC NEWS, (Jan. 5, 2022), https://www.nbcnews.com/pop-culture/pop-culture-news/major-events-are-getting-canceled-postponed-covid-s-running-list-rcna9782.

outreach event) to predict a likely future injury.  *Deshawn*, 156 F.3d at 344.  Because the court lacks jurisdiction to adjudicate the claims of a plaintiff without standing, CCDL's claims hereby are **<u>DISMISSED</u>**.

    B.  <u>Individual Plaintiffs</u>

Defendants contend that the claims brought by the individual plaintiffs are moot now that their municipal permits have been issued. [5]  In response, Plaintiffs state that they will "withdraw their prayer for temporary injunctive relief," but note that the issuance of the permits "does not moot their claims for permanent injunctive relief," nor their request for damages or the declaratory judgments contained in the complaint's prayer for relief.[6]  Pls.' Opp. at 1–2, ECF No. 58.

It is unnecessary to distinguish between Plaintiffs' requests for temporary and permanent injunctive relief.  In either case, regardless of whether each claim is moot, the individual plaintiffs lack standing to seek injunctive relief.  As with CCDL, they have not alleged that the defendants' delay in processing municipal permits is likely to harm them in the future.  "To have standing to seek injunctive relief, a plaintiff must demonstrate a 'real or immediate threat' of future injury."  *Carter v. CIOX Health, LLC*, 260 F. Supp. 3d 277, 287 (W.D.N.Y. 2017) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111–12 (1983)).  Because the individual plaintiffs have received their permits, they are no longer being deprived of a "process under which [they] may timely obtain municipal firearms

---

[5] Plaintiff Cordero received her municipal permit from BPD on November 17, 2021, and her state carry permit from DESPP on December 7, 2021.  Mot. to Dismiss, ECF No. 40.  Plaintiff Johnson received his municipal permit from the HPD on January 28, 2022.  Ex. A at ¶ 6, ECF No. 48-2.  Plaintiff Williams received her municipal permit from the NHPD on March 15, 2022.  Supp. Mot. to Dismiss, ECF No. 54.

[6] Although Plaintiff seeks to "withdraw" the request for temporary injunctive relief, the court notes that Plaintiffs did not file any motion for temporary injunctive relief (such as a motion for a temporary restraining order or a motion for a preliminary injunction) when filing the complaint.

permits[.]"  Compl. at Prayer for Relief ¶ 9.  Plaintiffs' only claim of future injury is that they may be subjected to future fingerprinting delays in the event that they seek to reapply for a permit after the expiration of their recently-issued permits.  *See* Pls.' Opp. at 5.  This claimed threat of future injury is too abstract for purposes of injunctive relief, which is designed to address actual and imminent injury to a plaintiff.

To the extent that the individual plaintiffs seek an injunction (or writ) on behalf of "similarly situated CCDL members" whose applications are still pending, *see* Pl.'s Opp. at 1–2, the prudential standing rule bars them from asserting the rights or legal interests of third parties.  *Rajamin v. Deutsche Bank Nat. Tr. Co.*, 757 F.3d 79, 86 (2d Cir. 2014) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.") (quoting *Warth v. Seldin,* 422 U.S. 490, 499 (1975)).  Plaintiffs cannot use the delays faced by third-party members of CCDL to assert any claims against Defendants, including any request for permanent injunctive relief.  Thus, the individual plaintiffs' official capacity claims for prospective injunctive relief hereby are **<u>DISMISSED</u>.**

Plaintiffs also bring individual capacity claims against Defendants to recover damages for their alleged constitutional violations.[7]  Compl. at ¶¶ 106, 118, 132, 147. Defendants have moved to dismiss each claim on the grounds that Plaintiffs have failed to state a claim.

---

[7] Plaintiffs, however, also state in each count of the complaint that "no damages could compensate them for the deprivation of their constitutional rights."  *Id.* at ¶¶ 114, 129, 144,155.  Plaintiffs' memorandum of law in opposition to the pending motions to dismiss confirms that Plaintiffs intend to seek damages for their § 1983 claims. Pls.' Opp. at 3–4. Thus, despite the allegations of the complaint, the court will evaluate each of the individual capacity claims.

1.  Fifth Amendment Claims

The individual plaintiffs claim that Defendants' conduct in administratively slowing the process for obtaining a municipal permit "to the point of an effective shut down," constitutes a violation of their Fifth Amendment rights to due process.  Compl. at ¶ 126. The Fifth Amendment's Due Process Clause applies only to the federal government, and not to state or municipal actors.  *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without due process of law.").  Plaintiffs' claims arise exclusively from the conduct of local government actors, rather than from any action that could be attributed to the federal government; as such, Plaintiffs have not stated a claim under the Fifth Amendment.  Accordingly, Count Three hereby is **DISMISSED** insofar as it is premised on the Fifth Amendment. [8]

2.  Equal Protection Claims

In the complaint, Plaintiffs seek damages for violations of the Equal Protection Clause under the Fourteenth Amendment.  Plaintiffs allege that Defendants allow people seeking certain licenses an opportunity for timely fingerprinting, but that they deny the same process as to the individual plaintiffs by substantially delaying their fingerprinting. For example, Plaintiffs state that nonresidents with out-of-state permits "can readily obtain a permit to carry a firearm" in Connecticut, while the individual plaintiffs are denied a "similar opportunity" to obtain such permit.  *Id.* ¶ 139.  Plaintiffs also allege that

---

[8] In their opposition to the instant motions to dismiss, Plaintiffs did not respond or otherwise object to Defendants' arguments for dismissing the claim under the Fifth Amendment Due Process Clause. *See* Pls.' Opp. at ECF No. 58.

Connecticut residents who reside in other municipalities, similar to nonresidents, have a "superior right" to obtain a permit to carry a firearm. *Id.* ¶ 141.

To maintain an equal protection claim, "a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005). The plaintiff must show that the "selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (citing *LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir. 1980)).

In their opposition to the instant motions to dismiss, Plaintiffs clarify that the thrust of their equal protection claim is that the individual plaintiffs living in Hartford, Bridgeport, and New Haven have been treated differently from individuals residing in other Connecticut municipalities. Pls.' Opp. at 21. Plaintiffs argue that those residing outside of Hartford, Bridgeport, and New Haven have their permit applications "timely processed" by their respective police chiefs, but that Defendants force the individual plaintiffs to incur substantial delays. Plaintiffs have not stated any violation of the Equal Protection Clause. The fact that an applicant in one town may be fingerprinted faster than an applicant residing in another town has no bearing on whether Defendants have engaged in differential treatment. Each of the Defendant Police Chiefs have only the authority to review applications from individuals residing within their respective municipalities. *See* Conn. Gen. Stat. § 29-28(b) "(Upon the application of any person having a bona fide permanent residence within the jurisdiction of any such authority, such chief of police . . . may issue a temporary state permit to such person to carry a pistol or revolver within the

19

state[.]").  Defendants have no control over any of the permit applications submitted to different police chiefs in other municipalities.  Thus, where there is no allegation that Defendants have treated any municipal permit application differently than any other application *over which they have authority*, Plaintiffs have not stated a viable equal protection claim.

Moreover, even if there were a basis to conclude that Defendants treated the individual plaintiffs' applications differently than other applications, Plaintiffs have not alleged that such differential treatment was due to an impermissible motive.  For example, the individual plaintiffs have not alleged that the defendant police chiefs delayed their applications due to their race, their religion, or a generalized desire to inhibit Plaintiffs' exercise of the Second Amendment.  In the complaint, Plaintiffs note in a general, conclusory manner that the defendants' cities have the highest black and Hispanic populations in the state.  Compl. at ¶ 60.  Plaintiffs do not, however, state that their race subjected them to a longer waiting period than other residents in the same municipality.  Indeed, the complaint omits the demographic information of all the individual plaintiffs.  By failing to allege not only differential treatment, but any impermissible motive, Plaintiffs have failed to state a claim under the Equal Protection Clause.  Accordingly, Count Four hereby is **__DISMISSED__**.

### 3.  Privileges & Immunities Claims

Plaintiffs allege that Defendants' conduct in preventing them from obtaining, possessing, and carrying firearms "deprives [Plaintiffs] of the privileges and immunities of citizens" guaranteed under Article IV of the Constitution.  Compl. at ¶ 152.

Article IV, § 2, cl. 1 of the Constitution provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. CONST. art. IV, § 2, cl. 1.  In plain language, the Clause entitles residents of one state to enjoy the same rights as citizens of other states.  *Selevan v. New York Thruway Auth.*, 584 F.3d 82, 102 (2d Cir. 2009); *see Paul v. State of Virginia*, 75 U.S. 168, 180 (1868) (noting that the Clause was designed "to place the citizens of each State upon the same footing with citizens of other States").  The Supreme Court of the United States has used the Privileges & Immunities Clause to protect out-of-state residents who seek occupational opportunities in states that carry discriminatory laws based on residency. *See Supreme Court of N.H. v. Piper*, 470 U.S. 274, 288 (1985) (declaring as unconstitutional New Hampshire law excluding nonresident from the bar); *Hicklin v. Orbeck,* 437 U.S. 518 (1978) (invalidating Alaskan statute giving preference to Alaskan residents in certain jobs).  In addition to protection from discriminatory state law, the Clause also protects against interstate discrimination from local governments.  *United Bldg. & Constr. Trades Council v. Mayor & Council of Camden,* 465 U.S. 208, 215–218 (1984)).  Only out-of-state residents, however, have standing to bring a claim under the Privileges and Immunities Clause.  *See Stevenson v. Town of Oyster Bay*, 433 F. Supp. 2d 263, 267 (E.D.N.Y. 2006) (citing cases).

Plaintiffs complain that "one of the privileges and immunities" of citizenship they have been deprived is the right to possess and carry a firearm.  *See* Compl. at ¶¶ 150–52. Plaintiffs misconstrue the Privileges & Immunities Clause, which protects out-of-state residents from the discriminatory laws of other states and their municipalities—it is not an enforcement mechanism to bring general challenges for the deprivation of fundamental

rights under the Constitution.   Thus, where Plaintiffs are not out-of-state residents challenging preferential treatment by another state or local government, they have not stated a claim for the Privileges & Immunities clause.   The court hereby **DISMISSES** Count 5 of the complaint. [9]

       4.  Qualified Immunity

Plaintiffs' two remaining claims are brought under § 1983 for the alleged violation of their constitutional right to bear arms under the Second Amendment and the Due Process Clause of the Fourteenth Amendment.   All three of the Defendant Police Chiefs seek to dismiss the claims, brought against Defendants in their individual capacities, on the grounds that they are entitled to qualified immunity.

The doctrine of qualified immunity "shields police officers acting in their official capacity from suits for damages . . . unless their actions violate clearly-established rights of which an objectively reasonable official would have known."   *Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006) (quoting *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir. 1999)). In analyzing the defense of qualified immunity, a court must balance two important interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."   *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).   Courts engage in a two-step inquiry in assessing qualified immunity.   First, whether the allegations demonstrate a violation of a constitutional or statutory right and, second, whether the right at issue clearly was established at the time of the alleged

---

[9] In their opposition to the instant motions to dismiss, Plaintiffs did not respond or otherwise object to Defendants' arguments for dismissing the claim under the Privileges & Immunities Clause. *See* Pls.' Opp. at ECF No. 58.

misconduct.  *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022).  Because Defendants contest only the second prong of the analysis—whether the right is clearly established—the court presumes for purposes of the motions to dismiss that Defendants concede that the alleged fingerprinting delay amounted to a constitutional violation.

In order to serve its purpose, the issue of qualified immunity should be decided "at the earliest possible stage in litigation."  *Hunter v. Bryant,* 502 U.S. 224, 227 (1991).  After all, if a case erroneously is permitted to go to trial, the "immunity" afforded by the doctrine effectively would be lost.  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  However, where qualified immunity is raised on a motion to dismiss, the defendant faces "a formidable hurdle" as "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense."  *Neary v. Wu*, 753 F. App'x 82, 84 (2d Cir. 2019) (citing *McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004)).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Vega v. Semple*, 963 F.3d 259, 274 (2d Cir. 2020) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  While a case "directly on point" is unnecessary, existing precedent must have placed the statutory or constitutional question beyond debate.  *McKinney v. City of Middletown*, 49 F.4th 730, 739 (2d Cir. 2022).  As the Supreme Court has instructed, "the clearly established right must be defined with specificity" rather than at "a high level of generality."  *City of Escondido, Cal. v. Emmons*, ---- U.S. ---- , 139 S. Ct. 500, 503 (2019).

Both Plaintiffs and Defendant Chief Garcia dedicate significant portions of their briefs on whether the right to carry a gun outside the home is clearly established by existing precedent.  *See* Mot. to Dismiss 10–13, ECF No. 24-1; Pls.' Opp. at 18–20.  A generalized right to carry a firearm is not at issue in this case.  There is no allegation that Defendants have denied to any of the plaintiffs the right to carry a firearm.  Indeed, each of the individual plaintiffs has received the municipal permit that allows them to apply for a permanent state carry permit.

In determining the specific rights at issue under a qualified immunity analysis, the court must evaluate "the violative nature of *particular* conduct" in light of the specific context of the case.  *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).  Here, the crux of the complaint is that Defendants have delayed the fingerprinting required by state law for processing municipal permits.  Because of the delay, obtaining a municipal permit took nearly two years for Plaintiff Cordero, and several months for Plaintiffs Johnson and Williams.  Thus, the allegations assert a right of timeliness (specifically, the right to obtain a firearm permit sooner than the individual plaintiffs were able to do so).  Therefore, the court's qualified immunity inquiry is whether the right to such timely process is "clearly established."  A review of existing case law reveals that the answer is a resounding "no."

The Supreme Court has held that the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense.  *See District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010).  The right to obtain a firearm has been "clearly established" for more than twenty years, but the right for eligible citizens to obtain a firearm within a specific timeframe is less so.  The court has not found any case to hold that a seven-month (or even a two-year) delay in

obtaining a firearm permit violates the Constitution.  In a similar case brought in the District of New Jersey, the district court found that an applicant's four-month wait time on his municipal firearm application did not amount to a constitutional violation.  *Rachlin v. Baumann*, No. CV 21-15343 (FLW), 2022 WL 4239790, at *18 (D.N.J. Feb. 22, 2022) (dismissing Second Amendment claim where Plaintiff failed to cite any authority holding that delays beyond a statutorily-required processing period—or, more generally, that the amount of time taken to process Plaintiff's application—violated the Second Amendment). As in *Rachlin*, the individual plaintiffs have not cited any authority supporting that they are entitled to action on their firearm application within a certain timeframe.  Without it, the court cannot find that Plaintiffs are entitled to such a right, let alone that such a right is "clearly established" such that the Defendant Police Chiefs, in the midst of the COVID-19 pandemic and its historic increase in the number of firearm applications, would have understood a delay in applicant fingerprinting to be unconstitutional.  Accordingly, the court finds that even if Plaintiffs have stated a violation of a constitutional right, because such right was not "clearly established" during the relevant period, Defendants are entitled to the defense of qualified immunity.  The individual capacity claims brought under the Second Amendment and the Due Process Clause of the Fourteenth Amendment hereby are **__DISMISSED__**.

   5.  Declaratory Relief

   The only remaining claims against Defendants are the official capacity claims for declaratory relief.  As an initial matter, Plaintiffs' request for a declaratory judgment confirming that they have an individual right to "obtain, possess, and carry firearms," Compl. at Prayer for Relief ¶ 6, has been rendered moot in light of the Supreme Court's

recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 213 L. Ed. 2d 387, 142 S. Ct. 2111 (2022).  In *Bruen*, the Supreme Court held that the Second Amendment's plain text guarantees to individuals a right to carry a firearm in public for self-defense.  *Id.* at 2135.  To grant a declaratory judgment confirming an individual right to carry would be to reiterate what the Supreme Court of the United States already has found.  Accordingly, such claim for declaratory relief hereby is **<u>DISMISSED</u>** as moot.  Plaintiffs' other claims for declaratory judgment request that the court declare as unconstitutional the lack of a timely process for obtaining a firearm carry permit, both generally and as allegedly practiced by the Defendants' respective police departments.  Compl. at Prayer for Relief ¶ 7–8.  For the reasons stated below, the court declines to exercise its discretion under the Declaratory Judgments Act ("DJA").

Under the DJA, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  "Since its inception, the [DJA] has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995); 28 U.S.C. § 2201(a).  The Second Circuit recently has clarified the legal standard governing a district court's decision to decline an exercise of its broad discretion under the DJA.  *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 96 (2d Cir. 2023).  In *Admiral Insurance*, the Second Circuit stated that the following factors should guide a district court on whether to exercise its discretion in reviewing a claim for a declaratory judgment: "(1) whether the [declaratory] judgment [sought] will serve a useful purpose in clarifying or settling the legal

issues involved;  (2) whether [such] a judgment would finalize the controversy and offer relief from uncertainty; (3) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; (5) whether there is a better or more effective remedy; . . . and (6) whether concerns for judicial efficiency and judicial economy favor declining to exercise jurisdiction[.]"  *Id.* at 99–100 (citing *Niagara Mohawk Power Corp. v. Hudson River-Black River Regul. Dist.*, 673 F.3d 84, 105 (2d Cir. 2012) (internal quotation marks omitted) (fourth alteration added)).   No single factor is dispositive in mandating that a district court should exercise (or that it should decline to exercise) its jurisdiction under the DJA.  *Niagra*, 57 F.4th at 100.  Instead, the factors are non-exhaustive, and a district court retains "wide latitude" to address other factors relevant to considerations of practicality and wise judicial administration.  *Id.*

The court finds that the declaratory judgment presently sought neither is likely to finalize the controversy nor is likely to serve an otherwise useful purpose in clarifying the legal issues involved.  Although Plaintiffs experienced fingerprinting wait times in seeking their municipal permits, those wait times occurred in the midst of the COVID-19 pandemic, and during a time when, as Defendants state, there was an unprecedented spike in permit applications.  Reply at 2, ECF No. 61.  Given the particular context in which Defendants' conduct occurred—the midst of a rare pandemic that caused both staffing shortages and public health concerns, neither from which the police departments were immune—the court finds little utility in issuing a declaratory judgment as to its constitutionality.  Although Plaintiffs certainly would be informed as to the constitutionality of the specific conduct, the

decision would not "clarify[] or settl[e] the legal issues involved." *Niagra*, 57 F.4th at 100. Whether a plaintiff is entitled to a timely process on their firearm application (presuming such right is guaranteed under the Constitution) likely will depend on a fact-specific inquiry unique to each case. Indeed, the waiting period experienced by a plaintiff may be held constitutional in one case while the same delay may be unconstitutional in a different case based upon different circumstances, such as the sufficiency of the particular application, the efforts of the police department in conducting the timely review of applications, etc. Here, where the delay was unique to the individual plaintiffs who applied for a firearm permit during a pandemic, a declaratory judgment would not settle the legal issues surrounding timely fingerprinting (under the Second and Fourteenth Amendments) in order to obtain a firearm permit. Moreover, as to practicality, judicial administration, and whether better remedies exist, the court finds reduced need for intervention in this case. Plaintiffs already have received their permits, and thankfully have alleged no actual harm arising from their respective waiting periods. The remaining considerations for the exercise of discretion (whether the case is being used as procedural fencing, or whether it would increase friction between sovereign legal systems) are inapplicable. *See Niagra*, 57 F.4th at 100. Because the court declines to exercise its discretion under the DJA, the official capacity claims for a declaratory judgment hereby are **DISMISSED.**

## IV. CONCLUSION

Defendant Garcia's motion to dismiss (ECF No. 24), and the motion to dismiss filed by Defendant Thody and Defendant Dominguez (ECF No. 27) hereby are **GRANTED** in their entirety. The court finds that CCDL lacks standing to bring its claims, and that

Plaintiffs have failed to state a claim on all counts of the Complaint brought against Defendants in their individual capacities.  Moreover, Plaintiffs do not have standing to seek injunctive relief for their official-capacity claims, and the court declines to exercise its jurisdiction on those official-capacity claims seeking declaratory judgment.  In light of the foregoing, all claims brought by CCDL and by the individual plaintiffs hereby are **DISMISSED.**  The supplemental motions to dismiss (ECF Nos. 40, 48, 54), and the motion for a status conference (ECF No. 62), hereby are denied as moot.

Because there are no claims remaining, the Clerk of Court kindly is instructed to terminate this case from the court's docket.

**IT IS SO ORDERED** this 28th day of March, 2023, at Hartford, Connecticut.

_____/s/_____
Omar A. Williams
United States District Judge
